**CHARTER FEDERAL SAVINGS BANK, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–513C.

United States Court of Federal Claims.

Aug. 31, 2005.

Thomas Matthew Buchanan, Winston & Strawn LLP, Washington, D.C., for plaintiff.

Craig Randall Gottlieb, United States Department of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

BRADEN, Judge.

On December 15, 2004, the undersigned became the fourth judge assigned to this *Winstar*-related case. Unfortunately, this case has languished in the United States Court of Federal Claims for over a decade without an adjudication of basic issues of liability.

As required by the January 20, 2004 remand of the United States Court of Appeals for the Federal Circuit in *Charter Fed. Sav. Bank v. United States,* 87 Fed.Appx. 175 (Fed.Cir.2004), however, this Memorandum Opinion and Order now will adjudicate:

> the general issue of whether there was a contract between Charter [Federal Savings and Loan Association] and the [G]overnment ... [and] whether any such contract includes a promise by the [G]overnment to pay for financial losses caused by regulatory changes.

*Id.* at 177.

## RELEVANT FACTS [1]

**A. Charter Federal Savings Bank's Acquisition Of Peoples Federal Savings And Loan Association And First Federal Savings And Loan Of New River Valley.**

In 1981, Charter Federal Savings Bank ("Charter"), then operating as First Federal Savings and Loan Association of Bristol, Virginia, had assets of approximately $150 million and a positive net worth of $7.7 million.

*See* Pl.Ex. 1 (Byington Aff.) ¶ 3. In mid–1981, the Supervisory Agent of the Federal Home Loan Bank Board of Atlanta ("FHLBB–Atlanta"), assigned to handle all supervisory mergers in the State of Virginia, contacted the President and Chief Executive Officer of Charter, to propose a merger with First Federal Savings and Loan of New River Valley, Pulaski, Virginia ("New River"). *See* Pl.Ex. 1 (Byington Aff.) ¶ 3; *see also* Pl.Ex. 4 (Connell Aff.) ¶ 9. New River's liabilities, however, exceeded the market value of assets by $13.5 million. *See* Pl.Ex. 1 (Byington Aff.) ¶ 4. FHLBB–Atlanta did not offer Charter the option of treating New River's negative net worth as supervisory goodwill.[2] *See* Pl.Ex. 1 (Byington Aff.) ¶ 4. On June 29, 1981, Charter's President and CEO advised FHLBB–Atlanta that Charter's Board of Directors "declined to enter into a voluntary merger at this time, feeling that it would not be financially prudent." Pl.Ex. 2 (June 29, 1981 Letter from Byington to Cohrs).

In November 1981, FHLBB–Atlanta again contacted Charter, this time to explore Charter's possible acquisition of New River and Peoples Federal Savings and Loan Associa-

---

1. The relevant facts recited herein are derived primarily from: the August 7, 1995 Complaint ("Compl."); Plaintiff's January 23, 1997 Motion for Partial Summary Judgment ("Pl. P.S.J. Mot."); the Government's March 25, 1997 Cross–Motion for Partial Summary Judgment and Partial Motion to Dismiss and Response ("Gov't Cross–Mot."); Plaintiff's June 16, 1997 Response ("Pl.Resp."); the Government's October 19, 2000 Supplemental Memorandum ("Oct. 19, 2000 Gov't Supp. Mem."); Plaintiff's January 12, 2001 Response ("Jan. 12, 2001 Pl. Supp. Resp."); Plaintiff's January 12, 2001 Proposed Findings of Uncontroverted Fact ("PPF"); the Government's January 17, 2001 Reply ("Jan. 17, 2001 Gov't Supp. Reply"); Plaintiff's March 21, 2002 Supplemental Response ("Mar. 21, 2002 Pl. Supp. Resp."); the Government's March 21, 2002 Reply ("Mar. 21, 2002 Gov't Reply"); the Government's April 30, 2004 Supplemental Memorandum in Opposition to Summary Judgment Concerning Liability Issues ("Apr. 30, 2004 Gov't Supp. Mem."); Plaintiff's May 21, 2004 Reply to Defendant's April 30, 2004 Supplemental Memorandum ("Apr. 30, 2004 Pl. Supp. Reply").

Other references herein are made to: Plaintiff's January 23, 1997 Exhibits ("Pl.Ex.__"); the February, 1991 Affidavit of E.L. Byington, Jr., Chief Executive Officer since 1964 and Chairman of the Board since 1987 of Charter Federal Savings Bank ("Byington Aff."); the March 25, 1991

Affidavit of Thurman Connell, Senior Vice President of the Federal Home Loan Bank in Atlanta, Georgia ("Connell Aff."); the January 10, 1997 Affidavit of Lawrence B. Muldoon, Supervisory Agent for the Federal Savings and Loan Insurance Corporation ("Muldoon Aff."); the January 14, 1997 Affidavit of M. Jack Vanatta, Principal Accounting Officer of First American Corporation ("Vanatta Aff."); the Government's October 19, 2000 Appendices ("Gov't Supp.App. __"); and the Plaintiff's January 12, 2001 Appendices ("Pl.Supp.App.__").

2. Goodwill is "an intangible asset ... the excess of cost over the fair value of the identifiable net assets acquired." *Coast Fed. Bank, FSB v. United States,* 323 F.3d 1035, 1039 (Fed.Cir.2003) (en banc); *see also* Advanced Financial Accounting at 12 ("Each identifiable asset and liability acquired is valued at its fair value at the date [of acquisition]. Any amount of the purchase price in excess of the fair value of the identifiable assets and liabilities acquired is viewed as the price paid for goodwill."); *Winstar III,* 518 U.S. at 849, 116 S.Ct. 2432 ("Goodwill recognized under the purchase method as the result of an FSLIC-sponsored supervisory merger was generally referred to as 'supervisory goodwill.' Recognition of goodwill under the purchase method was essential to supervisory merger transactions of the type at issue in this case.") (footnotes omitted).

tion of Roanoke, Virginia ("Peoples"). *See* Pl.Ex. 1 (Byington Aff.) ¶ 5; *see also* Pl.Ex. 4 (Connell Aff.) ¶ 9. Peoples' liabilities exceeded the market value of assets by $33.5 million. *See* Pl.Ex. 1 (Byington Aff.) ¶ 5. The combined negative net worth of New River and Peoples was approximately $47.1 million. *Id.* On this occasion, however, FHLBB–Atlanta advised Charter that the purchase method of accounting could be utilized and $47.1 million of supervisory goodwill recognized as an asset for regulatory capital purposes. *See* Pl.Ex. 1 (Byington Aff.) ¶ 6; *see also* Pl.Ex. 4 (Connell Aff.) ¶ 6. After considering the proposed acquisitions in light of these assurances, Charter's Board of Directors approved the acquisitions of New River and Peoples. *See* Pl.Ex. 1 (Byington Aff.) ¶ 6; *see also* Pl.Ex. 3 (Dec. 7, 1981 Board Minutes).

On December 8, 1981, Charter, New River, and Peoples executed a Merger Agreement with the following conditions:

*Effective Date and Conditions.* Unless changed by mutual agreement the effective date of the merger shall be within 30 calendar days of the date of final approval of the merger, *including use of the purchase method of accounting,* by the Federal Home Loan Bank Board, but in no case prior to *approval by the Federal Home Loan Bank Board.*

Pl.Ex. 5 (Dec. 8, 1981 Merger Agreement) ¶ 11 (emphasis added). This Merger Agreement also specifically provided that "in the event the use of purchase accounting is restricted by the Federal Home Loan Bank

Board, the Board of Directors of any of the three associations may withdraw from this Agreement." Pl.Ex. 5 (Dec. 8, 1981 Merger Agreement) ¶ 12.[3] The amount of supervisory goodwill at issue was not mentioned nor the amortization terms.

On December 8, 1981, Charter also sent a letter to FHLBB–Atlanta describing the proposed accounting procedures to be followed with respect to the New River and Peoples mergers:

the combined associations plan to liquidate a considerable portion of Peoples' and New River's assets within two years after the merger. Using the purchase method of accounting, all assets and liabilities of Peoples and New River would be discounted to present values[.] ... The straight-line method would be used to amortize the acquisition costs ... [h]owever, *the amortization period is limited by generally accepted accounting principles to a maximum of forty years. Id.*[4] The existence of acquisition costs in the merger of two associations under the purchase method of accounting is addressed in FHLBB Memorandum R–31(b).[5]

Pl. Supp.App. 9 (Dec. 10, 1981 Application for Merger) at CH032790–91 (emphasis added).

And, on December 8, 1981, Charter sent a letter to A.M. Pullen & Company, an independent accounting firm, reporting that "[t]he difference between the fair values of Peoples' and New River's assets less liabilities was recorded as goodwill." Pl. Supp. App. 9 (Dec. 10, 1981 Application for Merger)

---

**3.** Charter would not have acquired New River and Peoples without the benefit of recognizing supervisory goodwill as an asset for regulatory purposes, because Charter would have been subject "to a [G]overnment takeover immediately upon consummation of the Merger Agreement because the assumption of the acquired institutions' negative net worth would have left Charter below the minimum capital requirements." Pl. Ex. 1 (Byington Aff.) ¶ 9; *see also* Pl.Ex. 4 (Connell Aff.) ¶ 9.

**4.** The straight-line method is "appropriate when the asset use is expected to be relatively even over its estimated useful life or there is no discernible pattern of decline in service potential." Jan R. Williams, 2002 Gaap Guide: Restatement and Analysis of Current FASB Standards 12.08 (2002). ("2002 Gaap Guide"). According to the GAAP

Guide at 12.08, the straight-line method of depreciation is determined by the following formula:

$$\frac{\text{Cost less salvage value}}{\text{Estimated useful life in years}}$$

*Id.*

**5.** FHLBB Memorandum R–31(b), issued September 1, 1981, set forth guidelines on how an acquiring institution could recognize supervisory goodwill as an intangible asset, using the purchase method of accounting. This Memorandum provided that accounting for mergers should be in accordance with Generally Accepted Accounting Principles ("GAAP") and that the amortization period of supervisory goodwill could be no longer than forty years. *See* Gov't. Supp.App. 18 (FHLBB Memorandum R–31(b)).

at CH032797–98. The letter also stated that "such goodwill will be amortized over forty years[,]" and that the "straight-line method of amortization will be used." *Id.* at CH032797.

On December 9, 1981, A.M. Pullen & Company notified Charter that, based upon the intent to liquidate a considerable portion of Peoples' and New River's assets within two years, the mergers appropriately could be accounted for by the purchase method of accounting, in conformity with GAAP. *See* Pl. Supp.App. 9 (Dec. 10, 1981 Application for Merger) at CH032793–94. A.M. Pullen & Company also sent a letter the same date to FHLBB–Atlanta describing the accounting treatment for the proposed merger and advising that "[t]he difference between the fair values of [Peoples'] and [New River's] assets less liabilities is recorded as goodwill." *See* Pl. Supp.App. 9 (Dec. 10, 1981 Application for Merger) at CH032795. The letter also stated that *"such goodwill will be amortized over forty years[,]" and that the "straight-line method of amortization will be used." Id.* (emphasis added). The letter also explained that Charter "intends to liquidate a considerable portion of Peoples' and New River's assets as soon as possible, but essentially within two years after consummation of the merger." *Id.* at CH032796.

On December 10, 1981, Charter submitted an Application for Merger to obtain FHLBB approval of the proposed mergers with Peoples and New River. *See* Pl. Supp.App. 9 (Dec. 10, 1981 Application for Merger). In addition, Charter included: the December 8, 1981 Merger Agreement; the December 8, 1981 letter from Charter to FHLBB–Atlanta; the December 8, 1981 letter from Charter to A.M. Pullen & Company; the December 9, 1981 letter from A.M. Pullen & Company to Charter; and the December 9, 1981 letter from A.M. Pullen & Company to the FHLBB–Atlanta. *See* Pl. Supp.App. 9 (Dec. 10, 1981 Application for Merger) at CH032730–816.

On December 28, 1981, FHLBB–Atlanta sent a memorandum to the Regional Director of the FHLBB's Office of Examinations and Supervision ("OES") recommending that the FHLBB approve the Peoples and New River mergers. *See* Pl.Ex. 21 (Dec. 28, 1981 Mem. from Connell to Rundle) at WOB014 0588. This memorandum stated that "[t]he transaction shall be accounted for using the purchase method of accounting." *Id.* On January 2, 1982, the Regional Director of the OES sent a memorandum to the OES Secretary recommending that the FHLBB approve the proposed mergers. *See* Pl.Ex. 22 (Jan. 2, 1982 Mem. from Rundle to Finn) at WOB014 0584–85 ("Assuming the purchase accounting treatment will provide sufficient time for the resulting association to restructure its balance sheet ... the prospects for continued viability appear more favorable as a combined entity than for any of these associations on an individual basis.").

On January 22, 1982, the FHLBB approved the Merger Agreement and accepted Charter's proposal to recognize supervisory goodwill, subject to the following conditions:

> [Charter] shall furnish analyses, accompanied by a concurring opinion from its independent accountant, satisfactory to the Supervisory Agent and to the Office of Examinations and Supervision, which (a) specifically describe, as of the effective date of the merger, any intangible assets, including goodwill, or discount on assets arising from the merger to be recorded on [Charter's] books and (b) substantiate the reasonableness of amounts attributed to intangible assets, including goodwill, and the discount of assets and the related amortization periods and methods[.]

Pl.Ex. 7 (FHLBB Resolution No. 82–42) at 1.

On May 24, 1982, as required by FHLBB Resolution No. 82–42, A.M. Pullen & Company sent a letter to FHLBB–Atlanta describing Charter's proposed recognition of the acquired thrifts' negative net worth:

> The difference between the fair values ... of New River's and Peoples' assets less liabilities were recorded as intangible assets and goodwill. In evaluating the factors prescribed by generally accepted accounting principles and the guidelines described in FHLB Memorandum R–31(b), *goodwill will be amortized over forty years.* The straight-line method of amortization will be used. Intangible assets were identified in accordance with

generally accepted accounting principles and FHLB Memorandum R–31(b). The value of core deposits will be amortized over twenty years using the straight-line method. Charter considered its experience with existing customers in determining the method and period of amortization of such assets.

Pl.Ex. 8 (May 24, 1982 Letter from A.M. Pullen & Company) at 2 (emphasis added). This letter also included A.M. Pullen & Company's statement that the supervisory goodwill to be derived from these acquisitions was approximately $47.1 million. *Id.* at Ex. 1.

On March 1, 1982, Charter reported Peoples' and New River's $47.1 million combined deficit net worth, as supervisory goodwill, an intangible asset to be amortized on a monthly basis, as provided in the December 8, 1981 FHLBB-approved Merger Agreement. *See* Pl.Ex. 1 (Byington Aff.) ¶ 10; *see also* Pl. Supp. Ex. 10 (Consolidated Financial Statements) at FCH003 0093. After the mergers, Charter's tangible net worth, excluding supervisory goodwill, approximately was negative $41 million.[6] *See* Pl.Ex. 1 (Byington Aff.) ¶ 11.

During the fiscal year 1983, Charter sold $50 million of the $134 million in loans acquired from Peoples and New River. *See* Pl. Supp.App. 51 (Mar. 20, 1984 Charter Prospectus). In March 1984, Charter converted from a federally-chartered mutual association to a federally-chartered stock association and raised approximately $7 million from investors. *See* Pl.Ex. 1 (Byington Aff.) ¶ 12; *see also* Pl. Supp. Ex. 10 (Consolidated Financial Statements) at FCH003 0101. On June 30, 1984, Charter reported approximately $44.6 million of supervisory goodwill, total assets of $439.5 million, and total liabilities of $421 million. *See* Pl. Supp. Ex. 10 (Consolidated Financial Statements) at FCH003 0086.

6. After Peoples and New River merged with First Federal Savings and Loan Association, the name was changed to Charter Federal Savings and Loan Association. *See* Pl. Supp.App. 10 (Consolidated Financial Statements) at FCH003 0093.

**B. Charter Federal Saving Bank's Acquisition Of New Federal Savings & Loan.**

On November 16, 1984, the FHLBB issued Resolution No. 84–634, appointing the Federal Savings and Loan Insurance Corporation ("FSLIC") as sole receiver for five insolvent thrifts. *See* Pl. Supp. Ex. 47 (FHLBB Resolution No. 84–634). FSLIC was directed to liquidate these thrifts and combine the insured accounts into a new institution known as New Federal Savings and Loan Association of Knoxville ("New Federal") "for the express purpose of making [it] the subject of a supervisory acquisition." Pl.Ex. 9 (Muldoon Aff.) ¶ 2; *see also* Pl. Supp. Ex. 47 (FHLBB Resolution No. 84–634) at FCH003 0232. New Federal's liabilities exceeded the market value of assets by approximately $15 million. *See* Pl.Ex. 9 (Muldoon Aff.) ¶ 2.

In December, 1984, the FSLIC decided to solicit merger proposals for New Federal. *See* Gov't Ex. 16 (Dec. 27, 1984 Memorandum from Brick to O'Connell) at OCH002 1379. Federal Home Loan Bank Board of Cincinnati ("FHLBB–Cincinnati") invited Charter to bid on New Federal. *See* Pl.Ex. 1 (Byington Aff.) ¶ 13; *see also* Pl.Ex. 9 (Muldoon Aff.) ¶ 2; Pl. Supp.App. 4 (Byington Dep.) at 324–25. Charter's President met with the FSLIC Supervisory Agent to deliver Charter's bid, and informed the Supervisory Agent that "the bid was premised on the [G]overnment's agreement to permit Charter to treat the premium paid on deposits adjusted to the market value of certain liabilities of New Federal as supervisory goodwill[.]" Pl. Ex. 1 (Byington Aff.) ¶ 14; *see also* Pl.Ex. 9 (Muldoon Aff.) ¶ 4 ("Byington explicitly conditioned the acquisition upon the [G]overnment's agreement that Charter would treat the deficit net worth inherited from this failing institution as an intangible asset, called supervisory goodwill[.]"). Charter could not have acquired New Federal, without the ability to treat New Federal's negative net worth as an intangible asset.[7] *See* Pl.Ex. 9 (Muldoon Aff.) ¶¶ 4, 5.

7. As of February 19, 1985, Charter had to maintain a net worth of at least $23 million to maintain regulatory compliance. *See* 50 Fed. Reg. 6891; *see also* Pl. Supp.App. 22 (March 22, 1985 Letter from Byington to Cohrs) at 2. Using Regulatory Accounting Principles and recognizing New Federal's deficit net worth as supervisory

Charter proposed to acquire New Federal's deposits, amounting to approximately $196 million, at a premium of 7.5 percent after New Federal was converted to a stock institution. *See* Pl. Supp. Ex. 17 (March 13, 1985 Charter Proposal to Acquire New Federal) at FCH003 0026. Charter subsequently reduced the proposed discount rate to 7.25 percent. *See* Pl. Supp. Ex. 18 (March 26, 1985 Mem. from Rankin to Rundle) at WOL749 0315. McGladrey Hendrickson & Pullen, Charter's independent accountant, advised FHLBB–Cincinnati that Charter's proposal was conditioned on FHLBB approval authorizing Charter to recognize New Federal's negative net worth as an intangible asset:

> The difference between the fair values (as above) of New Federal's assets less liabilities would be recorded as intangible assets and goodwill.
>
> • In evaluating the factors prescribed by *generally accepted accounting principles, goodwill (unidentifiable intangible) will be amortized over fifteen years. The straight-line method of amortization will be used.*

Pl.Ex. 10 (Mar. 13, 1985 Letter from McGladrey Hendrickson to FHLBB–Cincinnati) at 2 (emphasis added).

On March 26, 1985, the FHLBB Supervisory Agent sent a memorandum to OES recommending approval of Charter's acquisition of New Federal. *See* Pl. Supp. Ex. 18 (Mar. 26, 1985 Mem. from Rankin to Rundle). This memorandum specifically acknowledged that *the premium paid* by Charter for New Federal *would be "recorded as goodwill and amortized [by Charter] over fifteen years utilizing the straight-line method of amortization." Id.* at WOL749 0318 (emphasis added).

On March 29, 1985, FSLIC and Charter entered into a Merger Agreement providing that the effective date of the merger would be subject to FHLBB approval. *See* Pl.Ex. 11 (March 29, 1985 Merger Agreement) § 12. Although the Merger Agreement did not

provide that supervisory goodwill could be recognized and amortized by Charter as an intangible asset, it provided that other contemporaneous written agreements between the parties related to the merger would be deemed part of the entire agreement:

> This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understanding of the parties in connection with it.

*Id.* § 15(a).

On March 29, 1985, the FHLBB issued Resolution Nos. 85–223, 85–224, and 85–225 authorizing Charter's acquisition of New Federal. *See* Pl.Ex. 12 (FHLBB Resolution No. 85–223); *see also* Pl.Ex. 13 (FHLBB Resolution No. 85–224); Pl.Ex. 14 (FHLBB Resolution No. 85–225). Resolution 85–223 provided:

### Accounting

\* \* \* \* \* \*

> RESOLVED FURTHER, That Charter shall furnish an analysis, accompanied by a concurring opinion from its independent accountant (which indicates that the transaction was consummated in accordance with generally accepted accounting principles except as otherwise authorized by the Bank Board), *satisfactory to the Supervisory Agent and to the Office of Examinations and Supervision* which (a) specifically describes, as of the effective date, any intangible assets, including goodwill or discounts and premiums arising from the acquisition to be recorded on the consolidated books of Charter, and (b) *substantiates the reasonableness and amounts attributed to intangible assets, including goodwill,* and the discounts and premiums *and the related amortization periods and methods* [.]

Pl.Ex. 14 at 7 (FHLBB Resolution No. 85–223) (emphasis added).

---

goodwill, Charter's net worth was projected at $24 million. *See* Pl. Supp.App. 22 (March 22, 1985 letter from Byington to Cohrs) at 2. If Charter could not have recognized New Federal's deficit net worth as supervisory goodwill, Charter's net worth would have been $9 million—well below the amount required for capital compliance. *Id.*

On March 29, 1985, Charter recorded New Federal's $15 million deficit net worth as supervisory goodwill. *See* Pl.Ex. 15 (June 30, 1985 Consolidated Financial Report) at 9–10. On June 30, 1985, pursuant to the requirements of FHLBB Resolution No. 85–223, Charter submitted a Consolidated Financial Report stating that Charter would utilize the purchase method of accounting in reporting Charter's financial status after the New Federal acquisition. *See* Pl.Ex. 15 (June 30, 1985 Consolidated Financial Report) at 9.

## C. Charter Federal Savings Bank's Acquisition Of Magnolia Federal Savings And Loan Association.

By 1985, Magnolia Federal Savings and Loan Association of Knoxville, Tennessee ("Magnolia") also encountered financial difficulties. *See* Pl.Ex. 1 (Byington Aff.) ¶ 19. Magnolia's liabilities exceeded the market value of assets by $24,000. *See* Pl.Ex. 1 (Byington Aff.) ¶ 20. Shortly after Charter's acquisition of New Federal, the FSLIC again contacted Charter regarding the potential acquisition of Magnolia. *See* Pl.Ex. 1 (Byington Aff.) ¶ 19. Thereafter, Charter submitted an offer to the FSLIC that included "a Discount Percentage of one percent from the face value of the insured accounts," but did not mention supervisory goodwill. *See* Gov't Supp.App. 26 (June 3, 1985 Bid to Receive Transferred Accounts) at 1.

On June 6, 1985, the FHLBB convened a meeting where Magnolia's impending insolvency was discussed. *See* Pl.Ex. 28 (Tr. of June 6, 1985 FHLBB Special Bank Board Meeting) at 8–9. No mention was made of Magnolia's supervisory goodwill. *Id.* On June 6, 1985, the FHLBB issued Resolution Nos. 85–443, 85–447, and 85–448, declaring Magnolia insolvent, appointing the FSLIC as Magnolia's sole receiver for purposes of liquidation, and approving the transfer of Magnolia's insured accounts from the FSLIC to Charter. *See* Pl.Ex. 16 (FHLBB Resolution No. 85–443); Pl.Ex. 17 (FHLBB Resolution No. 85–447); Pl.Ex. 18 (FHLBB Resolution No. 85–448). On June 7, 1985, Charter and the FSLIC executed a Transfer Agreement, under which Charter assumed Magnolia's

$24,000 deficit net worth. *See* Pl.Ex. 19 (June 7, 1985 Transfer Agreement); *see also* Pl.Ex. 1 (Byington Aff.) ¶ 20. Thereafter, however, Charter reported Magnolia's $24,000 deficit as supervisory goodwill to be amortized over 15 years on a straight-line basis. *See* Pl.Ex. 1 (Byington Aff.) ¶ 20; *see also* Pl.Ex. 15 (June 30, 1985 Consolidated Financial Report) at 9.

On July 10, 1985, Charter merged with First Federal Savings and Loan Association of Danville ("Danville"). *See* Pl.Ex. 15 (June 30, 1985 Consolidated Financial Report) at 10. Charter recorded the Danville acquisition as though it was effective June 30, 1985. *Id.* Charter's June 30, 1985 Consolidated Financial Report reported approximately $57 million of supervisory goodwill, total assets of approximately $736 million, and total liabilities of approximately $709 million. *Id.* at 2.

## D. The Enactment Of FIRREA And Its Adverse Impact On Charter Federal Savings Bank.

By the end of the 1980s, it became painfully apparent that the nation's thrift institutions were not adequately capitalized and needed to be subject to the same regulatory standards as national banks. To accomplish these objectives, on August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), a broad-ranging statute that reorganized and empowered the federal supervisory and enforcement authorities. FIRREA imposed new and far more stringent capital requirements and standards on thrifts. For example, FIRREA abolished the FSLIC; created a new thrift deposit insurance fund to be managed by the Federal Deposit Insurance Corporation ("FDIC"); transferred FHLBB powers to the Office of Thrift Supervision ("OTS"), which was made responsible for regulating all federally insured savings institutions; and established the Resolution Trust Corporation ("RTC") to liquidate or dispose of failed thrifts and their assets. *See United States v. Winstar Corp.,* 518 U.S. 839, 856, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) ("*Winstar III*").

In addition, FIRREA required the OTS to " 'prescribe and maintain uniformly applica-

ble capital standards for savings associations,' in accord with strict statutory requirements." *Id.* (quoting 12 U.S.C. § 1464(t)(1)(A)). FIRREA also required thrifts to comply by December 31, 1989 with new "core capital, tangible capital, and risk-based" capital requirements. Thrifts now had to maintain core capital (by definition excluding unidentifiable intangible assets such as supervisory goodwill) in an amount not less than three percent of the savings association's total assets. *See* 12 U.S.C. § 1464(t)(2)(A). Initially, FIRREA allowed thrifts to count "qualifying supervisory goodwill" toward half of the core capital requirements, but this accommodation was phased out by 1995. *See* 12 U.S.C. § 1464(t)(3)(A); *see also Winstar III,* 518 U.S. at 856–57, 116 S.Ct. 2432. Thrifts also had to maintain tangible capital, defined to exclude goodwill, of at least 1.5 percent of the savings association's total assets and risk-based capital of at least 6 percent of risk weighted assets. *See* 12 U.S.C. § 1464(t)(2)(B); *see also* 12 C.F.R. § 567.2.

Under the provisions of FIRREA, Charter's Thrift Financial Report for the quarter ended June 30, 1989 indicated that Charter had a negative tangible capital equal to $11.2 million. Accordingly, on September 19, 1989, the OTS sent a letter to Charter imposing strict limitations on Charter's operations and growth. *See* Pl. Supp. Ex. 27 (Sept. 19, 1989 Letter from OTS to Byington (imposing growth restrictions pursuant to Regulatory Bulletin 3a)).

As of September 30, 1989, Charter reported approximately $47 million of unamortized supervisory goodwill. *See* Pl. Supp. Ex. 26 (Nov. 13, 1989 OTS Examination Report) at WOL745 2419. Without the ability to treat supervisory goodwill as an asset, Charter fell short of core capital and tangible capital requirements by approximately $28 million and short of risk-based capital requirements by approximately $31 million. *Id.* at WOL745 2420. In 1990 and 1991, Charter closed several branches and experienced increased withdrawals. *See* Pl. Supp. Ex. 29 (Bartel Dep.) at 74–76; *see also* Pl. Supp. Ex. 33 (June 30, 1990 Annual Report).

On January 5, 1990, Charter requested OTS approval of a new Capital Plan. *See* Pl. Supp. Ex. 35 (Jan. 17, 1991 Letter from OTS to Charter) at WOL516 0748. On January 17, 1991, the OTS rejected this plan and required Charter to sign a Consent Agreement allowing the OTS to assume control of the institution. *Id.* at WOL516 0751–68.

## PROCEDURAL HISTORY

### A. Proceedings In The United States District Court For The Western District Of Virginia.

On February 4, 1991, Charter filed suit in the United States District Court for the Western District of Virginia to enjoin the FDIC and the OTS from placing Charter in receivership and/or revoking the institution's federal insurance deposit. *See Charter Fed. Sav. Bank v. Dir., Office of Thrift Supervision,* 773 F.Supp. 809, 814 (W.D.Va.1991). On August 16, 1991, the United States District Court for the Western District of Virginia issued a decision declaring that the parties entered into binding contracts obligating the Government to allow Charter to treat supervisory goodwill as an asset. *Id.* at 816.

### B. Proceedings In The United States Court Of Appeals For The Fourth Circuit.

On September 25, 1992, the United States Court of Appeals for the Fourth Circuit reversed the United States District Court for the Western District of Virginia, by holding that "the FHLBB did not contractually obligate itself (or its successor agencies) to permit Charter to use supervisory goodwill to meet capital requirements in the face of contrary new regulations." *Charter Fed. Sav. Bank v. Office of Thrift Supervision ("Charter II"),* 976 F.2d 203, 204 (4th Cir.1992). That federal appellate court also declined, however, to decide whether the FHLBB entered into a contract:

[W]e need not decide the contract issue because we find, in any event, that the FHLBB did not promise to exempt Charter from future capital regulations. We can assume, then, without deciding, the existence of an implied contract between

FHLBB (or OTS) and Charter and resolve the case on the issue of contract interpretation.

*Charter II,* 976 F.2d at 211.

Charter filed a petition for *writ of certiorari* that was denied on March 29, 1993. *See Charter Fed. Sav. Bank v. Director, Office of Thrift Supervision,* 507 U.S. 1004, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993).

On March 31, 1993, Charter wrote off the $41.1 million balance of unamortized goodwill. *See* Pl. Supp. Ex. 55 (May 4, 1993 Board Meeting Minutes) at CH 030486. On June 4, 1993, Charter submitted a new Capital Plan to OTS that included a common stock rights offering of more than $40 million. *See* Pl. Supp. Ex. 56 (June 4, 1993 News Release). OTS approved the Capital Plan, pending successful completion of the rights offering. *See* Pl. Supp. Ex. 57 (June 21, 1993 News Release). Charter, however, successfully completed the rights offering and achieved full capital compliance with minimum regulatory capital requirements by August 1993. *See* Pl. Supp. Ex. 1 (Def.'s Admis.) at 200, 205.

### C. Proceedings In The United States Court Of Federal Claims.

On August 7, 1995, Plaintiffs filed a Complaint in the United States Court of Federal Claims alleging four claims: (I) breach of contract; (II) breach of contract implied-in-law; (III) frustration of contract and commercial impracticability; and (IV) an unconstitutional taking of property. *See* Compl. ¶¶ 46–61. The case was assigned to the Honorable Roger B. Andewelt, now deceased.

On October 11, 1995, the case was stayed pending the decision in *Winstar Corp. v. United States,* 64 F.3d 1531 (Fed.Cir.1995) (en banc) ("*Winstar II*"). *See Charter v. United States,* No. 95–513 (Fed.Cl. Oct. 11, 1995) (Order Granting Motion to Staying Pending *Winstar* Decision). On July 1, 1996, the United States Supreme Court issued a decision in *Winstar III.* On August 28, 1996, this case was reassigned to the Honorable Loren A. Smith, then Chief of the United States Court of Federal Claims.

On January 23, 1997, Charter filed a Motion for Partial Summary Judgment asserting that "the undisputed, underlying facts can support only one finding—that the parties reached an understanding that Charter would acquire failed thrifts with a total deficit net worth in excess of $62 million if, and only if, the [G]overnment, in return, permitted Charter to treat that deficit net worth as an asset to be amortized over an agreed-upon number of years." Pl. P.S.J. Mot. at 20–21.

On March 25, 1997, the Government filed a Motion to Dismiss or, in the alternative, a Cross–Motion for Partial Summary Judgment, arguing that the United States Court of Appeals for the Fourth Circuit's dismissal of Charter's claims for breach of contract and breach of implied-in-law contract precluded Charter from re-litigating those claims in the United States Court of Federal Claims. On June 16, 1997, Charter filed a Response. On August 4, 1997, the Government filed a Reply.

On December 22, 1997, Chief Judge Smith issued a Show Cause Order in all *Winstar-*related cases where summary judgment motions or cross-motions on liability were pending directing the Government to show cause within 60 days why those motions should not be granted, and liability found on all *Winstar* contract issues. On February 20, 1998, the Government filed a Response to the Show Cause Order. On March 31, 1998, Charter filed a proposed Order granting the Motion for Partial Summary Judgment Regarding Liability. On April 30, 1998, the Government filed a Response to the proposed Order. On May 15, 1998, Charter filed a Reply. On May 29, 1998, the Government filed a Surreply. On July 2, 1998, Charter filed a Sur-rebuttal.

On July 21, 1998, the Government moved for a stay of the proceedings on the motions for summary judgment. On July 28, 1998, Charter filed a Response. On September 16, 1998, Chief Judge Smith issued an Order memorializing an August 11, 1998 oral order staying consideration of the motions for summary judgment until October 13, 1998.

On October 19, 2000, the Government filed a Supplement to the March 25, 1997 Motion to Dismiss. On January 12, 2001, Charter

responded. On January 17, 2001, the Government filed a Reply. On February 1, 2002, the case was next reassigned to the Honorable Diane G. Sypolt.

On March 21, 2002, Charter supplemented its January 12, 2001 response to the Government's Motion to Dismiss. On that same date, the Government replied to Charter's January 12, 2001 Response.

On October 9, 2002, the court granted the Government's Motion to Dismiss Charter's claims for breach of contract, breach of implied-in-law contract, frustration of contract, and commercial impracticability on the basis of collateral estoppel, and dismissed the claim for unconstitutional taking of property for lack of jurisdiction under the Due Process Clause of the Fifth Amendment to the United States Constitution. *See Charter Fed. Sav. Bank v. United States*, 54 Fed.Cl. 120, 132 (2002) (*"Charter III"*). On November 22, 2002, Charter appealed to the United States Court of Appeals for the Federal Circuit.

## D. Proceedings In The United States Court Of Appeals For The Federal Circuit.

On January 20, 2004, the United States Court of Appeals for the Federal Circuit reversed Judge Sypolt's dismissal of Charter's claims, remanded the case, and held that *Charter II* decided only the issue of *"whether a contract existed between Charter and FHLBB ...; and, if so, whether the contract provided that Charter could treat supervisory goodwill as capital during the entire specified amortization period."* *Charter Fed. Sav. Bank v. United States*, 87 Fed. Appx. 175, 177 (Fed.Cir. Jan.20, 2004) (*"Charter IV"*) (quoting *Charter II*, 976 F.2d at 210) (emphasis in original). Our appellate court held that the issue in *Charter II* was "whether the [G]overnment promised to *pay* for any financial losses caused by regulatory changes" and that the United States Court of Appeals for the Fourth Circuit "deliberately did not decide the broader issue of whether there was any kind of contract at all between Charter and the [G]overnment." *Id.* Accordingly, issue preclusion does not apply to whether the Government entered into a contract with Charter, pursuant to which the Government would pay for any losses caused by regulatory change. *Id.* at 178. Therefore, "the general issue of whether there was a contract between Charter and the [G]overnment remains open, as does the narrower issue ... of whether any such contract included a promise by the [G]overnment to pay for financial losses caused by a regulatory change." *Id.* at 177.

## E. Remand Proceedings In The United States Court Of Federal Claims.

On March 31, 2004, the parties returned to the United States Court of Federal Claims and the Government filed an Answer to the Complaint. On April 30, 2004, the parties filed simultaneous Supplemental Memorandum regarding Charter's January 23, 1997 Motion for Partial Summary Judgment concerning liability. On May 21, 2004, the parties filed simultaneous Responses to the Supplemental Memoranda.

\* \* \* \* \* \*

On December 15, 2004, the remand was transferred to the undersigned judge.[8]

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims is authorized under the Tucker Act, 28 U.S.C. § 1491(a)(1), to render judgment and money damages on any claim against the United States founded on the United States Constitution, any act of Congress, any regulation of an executive department, or an express or implied contract with the United States. *See United States v. Testan*, 424 U.S. 392, 397–398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The United States Supreme Court, however, has clarified that the Tucker Act does not create any substantive right for

---

8. On April 13, 2005, Charter and the Government filed Motions for Partial Summary Judgment regarding damages issues. On May 9, 2005, Charter and the Government filed Responses. On May 16, 2005, the Government filed a Reply. On May 19, 2005, Charter filed a Reply. The court's resolution of any potential damages arising from this Memorandum Opinion and Order will be made following further proceedings and an evidentiary hearing.

monetary damages. *See United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Therefore, to maintain jurisdiction in this court, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, or executive agency regulation that provides a substantive right to money damages. *See Khan v. United States*, 201 F.3d 1375, 1377 (Fed.Cir.2000).

In this case, plaintiffs properly have plead a claim for breach of contract. *See, e.g., Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314, 1319 (Fed.Cir.1997); *Gould, Inc. v. United States*, 67 F.3d 925, 929 (Fed.Cir. 1995).

### B. Standing.

To establish standing, Charter is required to be a party to a contract with the United States or in privity. *See Castle v. United States*, 301 F.3d 1328, 1339 (Fed.Cir.2002) (holding that only direct parties to the contract have standing to allege breach of contract claims based upon the contract); *see also So. California Fed. Sav. & Loan Ass'n. v. United States*, 422 F.3d 1319 (Fed.Cir. 2005) (same).

The Complaint alleges that Charter was a party to contracts with the Government, pursuant to which Charter obtained Government approval to recognize supervisory goodwill as an asset as partial consideration in certain supervisory mergers of New River, Peoples, and New Federal. Accordingly, Charter has established standing to sue the Government for breach of contract regarding those transactions. Charter, however, was not a party to a contract or in privity with the Government regarding the supervisory merger of Magnolia. Accordingly, Charter does not have standing to allege a breach of contract regarding that transaction.

### C. Controlling Precedent Regarding Implied–In–Fact Contract.

 The required elements for a contract with the Government are the same for express and implied-in-fact contracts, *i.e.*, "mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *La Van v. United States*, 382 F.3d 1340, 1346 (Fed.Cir.2004) (quoting *Cal. Fed. Bank v. United States*, 245 F.3d 1342, 1346 (Fed.Cir.2001) ("*CalFed*")). An implied-in-fact contract may be "founded upon a meeting of minds which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding." *Maher v. United States*, 314 F.3d 600, 606 (Fed.Cir. 2002) (quoting *Hercules, Inc. v. United States*, 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996)).

### 1. The Element Of Mutual Intent To Contract.

Manifesting mutual intent "ordinarily takes the form of an offer or proposal by one party followed by acceptance by the other party or parties." RESTATEMENT (SECOND) OF CONTRACTS § 22(1) (1981) ("RESTATEMENT"). In several *Winstar*-related cases, the United States Court of Appeals for the Federal Circuit has discussed the proof that plaintiff must establish to evidence the element of mutual intent to contract.

In *Cal. Fed. Bank v. United States*, 245 F.3d 1342, 1346 (Fed.Cir.2001), the United States Court of Appeals for the Federal Circuit held that mutuality of intent to contract may exist, even if no single document incorporated all relevant contract terms. *Id.* at 1346–47. In that case, the plaintiff-appellant acquired six thrifts in three separate acquisitions. *Id.* at 1344–45. In the first, the Government issued a Forbearance Letter allowing plaintiff-appellant to record excess liabilities as supervisory goodwill, amortized over 35 to 40 years. *Id.* at 1345. The Government also executed an Assistance Agreement affording plaintiff-appellant capital credit and expressly incorporating the Forbearance Letter. *Id.* In the subsequent mergers, however, the Government did not enter into an Assistance Agreement and no single document expressly incorporated all the terms of the agreements. *Id.* Nevertheless, the United States Court of Appeals for the Federal Circuit affirmed the determination of the United States Court of Federal Claims that "[i]f the factual records of indi-

vidual cases show intent to contract with the [G]overnment for specified treatment of goodwill, and documents such as correspondence, memoranda and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] or [supervisory action agreement] should be irrelevant to the finding that a contract existed." *Id.* at 1347 (quoting *Cal. Fed. Bank, FSB v. United States,* 39 Fed.Cl. 753, 773 (1997)).

In *La Salle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363 (Fed.Cir.2003), the United States Court of Appeals for the Federal Circuit upheld a contractual relationship between plaintiff-appellant and the Government for favorable treatment of goodwill, despite the fact that the terms were recorded in FHLBB Resolutions and other agency documents instead of contract documents. *Id.* at 1370. In that case, the appellate court determined that the FHLBB Resolutions evidenced that plaintiff-appellant could use the purchase method of accounting for goodwill, but only if it submitted a stipulation of its intent to do so in accordance with FHLBB Memorandum R–31b, that limited the amortization of supervisory goodwill to no more than forty years. *Id.*

In *D & N Bank v. United States,* 331 F.3d 1374 (Fed.Cir.2003), the United States Court of Appeals for the Federal Circuit held that "[a]lthough a contract may arise as a result of the confluence of multiple documents, there must still be a *clear indication of intent to contract* and the other requirements for concluding that a contract was formed." *Id.* at 1377 (citing *CalFed,* 245 F.3d at 1347) (emphasis added). In that case, plaintiff-appellant argued that, taken together, the relevant Merger Agreement, internal Government memoranda, an FHLBB Resolution, and the submission of an accountant's letter established the mutual intent to contract. *Id.* at 1378. Our appellate court disagreed, because "none of the documents proffered ... mentions goodwill or the accounting treatment thereof." *Id.*

In *Anderson v. United States,* 344 F.3d 1343 (Fed.Cir.2003), plaintiff-appellant submitted a Merger Application, in which it requested a 40–year amortization period for goodwill. *Id.* at 1347. The FHLBB staff recommended against granting the request, but recommended approval of other forbearance requests. *Id.* The FHLBB issued a Forbearance Letter that made no mention of goodwill amortization. *Id.* at 1348. The FHLBB also issued a Resolution referencing the goodwill needed to be mentioned in the standard clause requiring an accountant's letter. *Id.* at 1357. Accordingly, the United States Court of Appeals for the Federal Circuit held there was no evidence that the Government expressed an intent to contract regarding the amortization of supervisory goodwill over an extended period of time. *Id.*

Recently, in *Fifth Third Bank of Western Ohio v. United States,* 402 F.3d 1221 (Fed. Cir.2005), the United States Court of Appeals for the Federal Circuit held that contractual liability was established under facts very similar to those in the instant case. *Id.* at 1231–36. In *Fifth Third,* plaintiff-appellant acquired several failing thrifts in a series of similar transactions. The Federal Home Loan Bank of Cincinnati ("FHLBB–Cincinnati") contacted plaintiff-appellant to propose a supervisory merger that would allow the failing thrift's negative net worth to be recognized as supervisory goodwill, toward regulatory compliance, and amortized over an extended period of time, varying from 10 years for one acquired institution up to 30 years for another. *Id.* at 1225. Plaintiff-appellant and the failing thrift entered into a Merger Agreement conditioned upon FHLBB approval. *Id.* Subsequently, an Application was submitted and a Resolution issued by the FHLBB that only required an opinion from an independent accountant confirming the use of the purchase method of accounting, specifically describing any goodwill arising from the purchase to be recorded, substantiating the reasonableness and amounts of the goodwill, and the length of the amortization period. *Id.* at 1226. The FHLBB approved each transaction with a Resolution. *Id.* at 1227. The United States Court of Appeals for the Federal Circuit concluded that the totality of "negotiations, contemporaneous documents, and the circumstances surrounding the transactions at issue [established that the parties] intended

to enter into a binding agreement[.]" *Id.* at 1233. Issues of using the purchase method of accounting, amortizing supervisory goodwill over an extended period of time, and counting supervisory goodwill as an asset for purposes of meeting capital reserve requirements were recognized as "clearly on the table and available as far as the FHLBB was concerned[.]" *Id.* Accordingly, our appellate court recognized that "[t]he clincher is the consequences," supporting contractual liability in transactions that otherwise would have immediately placed the financial institution in violation of capital requirements. *Id.* at 1232.

### 2. The Elements Of Consideration.

Consideration is a performance or a return promise that is bargained for. *See* RESTATEMENT § 71(1). In this case, as in many other *Winstar* cases, the Government bargained for Charter to acquire several failing thrifts to prevent their insolvency and avoid FSLIC liquidation. *See Winstar III,* 518 U.S. at 847, 116 S.Ct. 2432 ("Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions[.]"). By acquiring these failing institutions, Charter saved the "FSLIC insurance fund tens of millions of dollars." Pl.Ex. 4 (Connell Aff.) ¶ 10. In exchange, Charter bargained for and received the Government's permission to recognize the resulting supervisory goodwill as an intangible asset to be amortized over a period of years. *See Winstar II,* 64 F.3d at 1542 ("If the parties did not intend to use supervisory goodwill for regulatory capital purposes there would simply be no reason for the extensive negotiations and the conditions regarding its use."); *see also Winstar III,* 518 U.S. at 853, 116 S.Ct. 2432 ("[T]he accounting treatment to be accorded supervisory goodwill ... was the subject of ... arrangements

between the regulators and the acquiring institutions.").

In this case, the court has determined that valid consideration supported a contractual relationship between Charter and the Government regarding the recognition of supervisory goodwill toward meeting regulatory capital requirements in the supervisory mergers of New River, Peoples, and New Federal, but not the Magnolia transaction.

### 3. The Element Of Authority To Bind The Government.

The Government argues that the contracts for supervisory goodwill between Charter and the Government are invalid because the Supervisory Agents of FHLBB–Atlanta, FHLBB–Cincinnati, and the FSLIC did not have authority to bind the Government. *See* Jan 17, 2001 Gov't Supp. Reply. The FHLBB, not the regional bank boards, however, bound the Government by approving the mergers.[9]

FHLBB–Atlanta contacted Charter to propose the New River and Peoples acquisition and promised Charter that it could treat the resulting supervisory goodwill as an asset. *See* Pl.Ex. 1 (Byington Aff.) ¶ 5; *see also* Pl.Ex. 4 (Connell Aff.) ¶ 9. In response, Charter submitted a proposal and subsequently entered into a Merger Agreement with New River and Peoples. *See* Pl.Ex. 5 (Dec. 8, 1981 Merger Agreement). After Charter submitted the Merger Agreement for approval, and FHLBB–Atlanta authorities submitted memoranda recommending approval, the FHLBB authorized the transaction, contractually binding the Government. *See* Pl.Ex. 21 (Dec. 28, 1981 Memorandum from Connell to Rundle); *see also* Pl.Ex. 22 (Jan. 22, 1982 Memorandum from Rundle to Finn); Pl.Ex. 7 (FHLBB Resolution No. 82–42).

Likewise, FHLBB–Atlanta authorities contacted Charter to propose the New Federal

---

9. After the New River and Peoples acquisitions, the FHLBB delegated authority to Regional Board Principle Supervisory Agents ("PSAs") to "approve merger applications in which goodwill is included in assets." *See* Delegation of Authority Regarding Merger Approvals, 47 FED. REG. 8152 (Feb. 25, 1982); *see also Fifth Third,* 402

F.3d at 1236 ("[W]e read the 1982 delegation as evidence of the FHLBB's intention not to review individual mergers involving supervisory goodwill[.]"). All of the supervisory mergers that Charter entered into, however, were approved by the FHLBB, not the Regional Boards.

acquisition promising Charter that resulting supervisory goodwill would be recognized as an asset. *See* Pl.Ex. 1 (Byington Aff.) ¶ 13; *see also* Pl.Ex. 9 (Muldoon Aff.) ¶ 2. In response, Charter submitted a proposal and entered into a Merger Agreement. *See* Pl. Ex. 11 (Mar. 29, 1985 Merger Agreement).

In *United States v. Winstar Corp.*, 518 U.S. at 890, 116 S.Ct. 2432, the United States Supreme Court settled that "the [FHLBB] and FSLIC had ample statutory authority to . . . promise to permit respondents to count supervisory goodwill and capital credits toward regulatory capital and to pay respondents' damages if that performance became impossible." *See also Home Sav. of Am., FSB v. United States*, 399 F.3d 1341, 1357 (Fed.Cir.2005) (holding that *Winstar III* "unequivocally demonstrate[d] that transactions authorized by [the grant of general authority under 12 U.S.C.] § 1725(c)" were lawful); *Hometown Fin., Inc. v. United States*, 409 F.3d 1360, 1365 (Fed.Cir.2005) (same).

**D. The Court's Resolution Of The Remand.**

**1. Charter Agreed To Enter Into Supervisory Mergers Of New River And Peoples In Exchange For The Government's Agreement To Recognize $47.1 Million Of Supervisory Goodwill To Be Amortized Over Forty Years Toward Regulatory Capital Requirements.**

█ The record evidences that Charter and the Government manifested mutual intent to contract regarding the regulation of supervisory goodwill. The FHLBB–Atlanta contacted Charter to propose a merger. *See* Pl.Ex. 4 (Connell Aff.) ¶ 9; *see also* Pl.Ex. 1 (Byington Aff.) ¶ 5. Initially, Charter rejected the Government's proposal because the treatment of supervisory goodwill as an asset was not "on the table." *See* Pl.Ex. 2 (June 29, 1981 Letter from Byington to Cohrs). Only after FHLBB–Atlanta assured Charter that it could use the purchase method of accounting and recognize $47.1 million of supervisory goodwill resulting from the acquisitions as an asset for regulatory capital purposes did Charter execute the Merger Agreement, expressly conditioned on the FHLBB's approv-

al of Charter's use of the purchase method of accounting. *See* Pl.Ex. 5 (Dec. 8, 1981 Merger Agreement) ¶ 11; *see also* Pl.Ex. 1 (Byington Aff.) ¶ 6; Pl.Ex. 4 (Connell Aff.) ¶ 6. Charter submitted an Application for Merger to the FHLBB that included the Merger Agreement, as well as four other documents, describing Charter's proposed use of the purchase method of accounting and amortization of supervisory goodwill in detail. *See* Pl. Supp.App. 9 (Dec. 10, 1981 Application for Merger). Thereafter, FHLBB–Atlanta sent a Memorandum to OES describing the terms of the agreement and recommending approval. *See* Pl.Ex. 21 (Dec. 28, 1981 Mem. from Connell to Rundle) at WOB014 0588. Then, the OES Regional Director sent a Memorandum to the OES Secretary recommending approval of the mergers. *See* Pl.Ex. 22 (Jan. 2, 1982 Mem. from Rundle to Finn) at WOB014 0584–85. On January 22, 1982, the FHLBB issued Resolution No. 82–42, approving the mergers on the condition that Charter's independent accountants issue a letter setting forth Charter's proposed treatment of supervisory goodwill. *See* Pl.Ex. 7 (FHLBB Resolution No. 82–42). As required by Resolution No. 82–42, Charter's independent accountants sent a letter to the FHLBB describing Charter's treatment of the acquired thrifts' negative net worth, a prerequisite to FHLBB's approval of the merger. *See* Pl.Ex. 8 (May 24, 1982 Letter from A.M. Pullen & Company to FHLBB–Atlanta).

Therefore, the FHLBB was fully aware that it was entering into an agreement with Charter where the recognition of supervisory goodwill as an asset was "clearly on the table." *Fifth Third*, 402 F.3d at 1233. Moreover, as in *Fifth Third*, contractual liability also is evidenced because without the ability to treat supervisory goodwill as an intangible asset, the New River and Peoples mergers immediately would have placed Charter in violation of the FHLBB's capital requirements. *See* Pl.Ex. 4 (Connell Aff.) ¶ 9.

█ The Government also argues that Charter cannot sue for breach of contract regarding the New River and Peoples supervisory mergers because Charter made misrepresentations to the FHLBB in the Merger Agreements. *See* Oct. 19, 2000 Gov't

Supp. Mem. at 44. To establish the defense of misrepresentation, the Government must allege facts sufficient to establish that: (1) there was a misrepresentation; (2) the misrepresentation was either fraudulent or material; (3) the misrepresentation operated as an inducement to entering into the contract; and (4) the innocent party was justified in relying on the misrepresentation. *See* RESTATEMENT § 164 cmt. a. The Government claims that, because Byington stated in a July 11, 2000 deposition that no specific plan "had been formulated at that point on a time table," Gov't Supp.App. 35 (July 11, 2000 Byington dep. at 156–58), Charter's 1981 representation to "liquidate a considerable portion of Peoples' and New River's assets as soon as possible, but essentially within two years" was a misrepresentation. Gov't Supp. App. 24 (Dec. 9, 1981 Letter from A.M. Pullen & Company to Byington); *see also* Pl.Ex. 6 (Dec. 9, 1981 Letter from A.M. Pullen & Company to FHLBB–Atlanta). The fact that Charter did not have a specific timetable for selling assets does not evidence that Charter did not intend to sell a portion thereof. Charter's sale of approximately $50 million of $95 million in loans that were acquired from New River and Peoples supervisory mergers during fiscal year 1983 makes this point. *See* Pl. Supp.App. 51 (Mar. 20, 1984 Charter Prospectus) at 12; *see also* Pl. Supp. App. 9 (Application for Merger of Dec. 10, 1981) at CH032809, CH032815. Therefore, the Government has not stated sufficient facts to establish a claim for misrepresentation.

For these reasons, the court has determined that Charter and the Government had a contractual agreement regarding the recognition of supervisory goodwill resulting from the supervisory mergers of New River and Peoples.

### 2. Charter Agreed To Enter Into The Supervisory Merger Of New Federal Savings And Loan In Exchange For The Government's Agreement To Recognize $15 Million Of Supervisory Goodwill Amortized Over Fifteen Years Toward Regulatory Capital Requirements.

■ Charter's offer to acquire New Federal was premised on the ability to use the purchase method of accounting. *See* Pl.Ex. 1 (Byington Aff.) ¶ 14; *see also* Pl.Ex. 9 (Muldoon Aff.) ¶ 5. The March 29, 1985 Merger Agreement between FSLIC and Charter, however, did not address the issue of supervisory goodwill. *See* Pl.Ex. 11 (Mar. 29, 1985 Merger Agreement). The March 29, 1985 Merger Agreement, however, contained an integration clause providing that the Merger Agreement "together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement ... and supersedes all prior agreements and understandings of the parties." *Id.* § 15(a).

Accordingly, the integration clause incorporated a contemporaneous March 29, 1985 FHLBB Resolution 85–223 approving Charter's supervisory merger of New Federal, subject to an opinion from Charter's independent accountant "substantiat[ing] the reasonableness and amounts attributed to intangible assets, including goodwill ... and the related amortization periods and methods." Pl.Ex. 12 (FHLBB Resolution 85–223) at 7. On June 30, 1985, Charter's accountants informed the FHLBB that Charter planned to recognize $15 million in supervisory goodwill under the purchase method of accounting. *See* Pl.Ex. 15 (June 30, 1985 Consolidated Financial Report) at 9.

For these reasons, the court has determined that Charter and the Government had a contractual agreement regarding the recognition of supervisory goodwill resulting from the supervisory merger of New Federal.

### 3. The Supervisory Merger Of Magnolia Federal Savings And Loan Association.

■ The negotiations, contemporaneous documents, and circumstances surrounding the Magnolia acquisition do not evidence that Charter and the Government had any agreement regarding the recognition of Magnolia's deficit net worth as an intangible asset for a specified number of years. Unlike Charter's supervisory mergers with New River, Peoples, and New Federal, the treatment of supervisory goodwill as an asset was not

"clearly on the table and available" as far as the FHLBB was concerned. Charter's offer to acquire Magnolia did not mention supervisory goodwill. *See Fifth Third*, 402 F.3d at 1233; *see also* Gov't App. 26 (June 3, 1985 Bid to Receive Transferred Accounts). In addition, when the FHLBB met to decide whether to approve the Magnolia acquisition, the Board Members discussed Charter's offer of "a 1 percent discount on the deposits at Magnolia," and that "the Charter ... bid will result in a cost savings of about $130,000 to the FSLIC," but made no mention of supervisory goodwill. *See* Pl.Ex. 28 (Tr. of June 6, 1985 FHLBB Special Bank Board Meeting) at 9. After the meeting, the FHLBB approved the Magnolia acquisition by issuing three Resolutions, none of which mentioned supervisory goodwill. *See* Pl.Ex. 16 (FHLBB Resolution No. 85–443); Pl.Ex. 17 (FHLBB Resolution No. 85–447); Pl.Ex. 18 (FHLBB Resolution No. 85–448). As in *D & N Bank*, since "none of the documents proffered ... mentions goodwill or the accounting treatment thereof," the Government's intention to be bound is "nowhere to be found." *D & N Bank*, 331 F.3d at 1378.

For these reasons, the court has determined that Charter and the Government did not have a contractual agreement regarding the recognition of supervisory goodwill resulting from the supervisory merger of Magnolia.

### 4. It Is Settled Law That The Government Contracts Authorizing The Recognition Of Supervisory Goodwill Includes A Promise By The Government To Pay For Financial Losses Caused By Regulatory Changes.

On remand, the United States Court of Appeals for the Federal Circuit has directed the court to determine whether the contractual agreements between Charter and the Government with respect to the supervisory mergers of New River, Peoples, and New Federal "includes a promise by the [G]overnment to pay for financial losses caused by regulatory changes." *Charter IV*, 87 Fed.Appx. at 177. As a matter of law, the United States Supreme Court held in *Winstar III*, that "the Government breached these contracts [concerning supervisory goodwill] when, pursuant to the new regulatory capital requirements imposed by FIRREA, 12 U.S.C. § 1464(t), the federal regulatory agencies limited the use of supervisory goodwill and capital credits in calculating [Charter's] net worth." *Winstar III*, 518 U.S. at 870, 116 S.Ct. 2432.

Although the Government did not agree to exempt Charter from regulatory changes, as the United States Supreme Court held in *Winstar III*, "[w]e read this promise as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence." *Winstar III*, 518 U.S. at 868–69, 116 S.Ct. 2432. In this case, the "promised condition" was that the Government would allow Charter to recognize supervisory goodwill as an intangible asset over 40 years. The regulatory changes required by FIRREA also caused the "nonoccurrence" in this case.

### 5. The Remedy For Frustration Of Contract And Commercial Impracticability Is One Of Damages That Will Be Revisited By The Court.

Count III of the Complaint alleges that "[t]he enactment of FIRREA, together with the promulgation of implementing regulations, constitute an unexpected superseding event that runs contrary to and frustrates the purposes of the contracts [and therefore] the contracts should be rescinded, and the parties returned to the *status quo ante*." Compl. ¶ 56.

An injured party is entitled to rescission "if the defendant repudiated the contract or committed a total breach." *Admiral Fin. Corp. v. United States*, 378 F.3d 1336, 1344 (Fed.Cir.2004) (citing *Mobil Oil*, 530 U.S. at 608, 120 S.Ct. 2423). When an injured party is allowed to treat the contract as rescinded, courts have recognized the availability of restitution as a remedy, returning the injured party to the "*status quo ante* instead of relying on the terms of the contract to obtain damages." *Admiral*, 378 F.3d at 1344. The court has determined that the Government's breach constitutes a total breach of the con-

tract, *i.e.*, one that "so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." *Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604, 608, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (quoting RESTATEMENT § 243 (1979)); *see also Hansen Bancorp, Inc. v. United States,* 367 F.3d 1297, 1311 (Fed. Cir.2004) ("[T]he critical part of this formulation is the statement that the breach 'substantially impairs the value of the contract to the injured party at the time of the breach.'"). In this case, the ability to treat supervisory goodwill as an intangible asset to be amortized over a substantial number of years was a material term of the agreement, the breach of which "substantially impairs the value of the contract" and Charter is entitled to establish damages caused by that breach. *Id.*

Because the issue of whether Charter may treat the contracts as rescinded and return to the *status quo ante* is related to determining Charter's remedy rather than to whether the Government is liable, the court will revisit this issue when determining damages. The court would commend to the parties the court's view of the vitality of restitution as an alternative to damages in *Winstar*-related cases. *See American Capital Corp. v. United States,* 59 Fed.Cl. 563, 576–80 (2004).

### CONCLUSION

For the reasons discussed herein, the court has determined, pursuant to the remand of the United States Court of Appeals for the Federal Circuit in *Charter Fed. Sav. Bank v. United States,* 87 Fed.Appx. 175 (Fed.Cir. 2004), that there was a contract between Charter and the Government regarding the recognition of supervisory goodwill toward regulatory compliance as a result of the supervisory mergers of New River, Peoples, and New Federal. There was no such agreement regarding the supervisory merger of Magnolia. In addition, as the United States Supreme Court held in *Winstar III,* as a matter of law, the Government promised to pay financial losses caused by the regulatory

changes required by FIRREA. *See Winstar III,* 518 U.S. at 868–69, 116 S.Ct. 2432.

The court will schedule a telephone conference with counsel for the parties to ascertain a convenient date to schedule an evidentiary hearing on damages.

**IT IS SO ORDERED.**